IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | | |
|---|---|---|
| **IN THE MATTER OF THE SEARCHES OF** | ) | |
| | ) | **FILED UNDER SEAL** |
| **100 BRIGHT STAR COURT, LYNCHBURG** | ) | |
| **VIRGINIA 24501, TO INCLUDE** | ) | |
| **CURTILAGE AND** | ) | Case No.    6:23mj25 |
| **OUTBUILDING/VEHICLES ON THE** | ) | |
| **CURTILAGE OF THE PROPERTY; AND** | ) | |
| | ) | |
| **A WHITE 2007 LEXUS LS460, VIN:** | ) | |
| **JTHGL46F475014911, VIRGINIA PLATE:** | ) | |
| **5675XJ.** | ) | |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH AND SEIZURE WARRANT**

I, Daniel Bailey, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises, outbuildings, and curtilage of

the location known as 100 Bright Star Court, Lynchburg Virginia 24501 ("TARGET

ADDRESS") located in the City of Lynchburg, Virginia and to search and seize a white 2007

Lexus LS460 (VIN: JTHGL46F475014911), with Virginia Registration: 5675XJ ("TARGET

VEHICLE"), which are located within the Western District of Virginia and further described in

Attachment A, for the things described in Attachment B.

2.     I am an investigator or law enforcement officer of the United States within the

meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States

who is empowered by law to conduct investigations of, and make arrest for, the offenses

enumerated in Titles 18, 19, 21, 31 of the United States Code and other related offenses, since 2017.

3.      I am a Task Force Officer with the Drug Enforcement Administration (DEA) and have been since 2017.  I am also a Detective with the Lynchburg Police Department (Virginia) and have been so employed since 2002. I am currently assigned to investigate drug trafficking organizations as a member of the DEA, Washington Field Division/Roanoke Resident Office. My duties as a Task Force Officer involve the investigation of various criminal activities of narcotics traffickers and their associates.  In investigating these matters, I have acted as a case agent, an undercover agent, and a contact agent for confidential sources.  These investigations have resulted in the issuance of federal search warrants, seizure warrants, indictments, and convictions of persons for federal narcotics violations.  During my employment as a law enforcement officer, I have received multiple hours of training in narcotics enforcement and investigative techniques, and I have personally participated in numerous investigations.  I have also spoken on numerous occasions with informants, suspects, and other experienced narcotics traffickers concerning the methods and practices of drug traffickers, including the methods and practices used by traffickers of methamphetamine, heroin, and cocaine. I have been involved in the execution of numerous search warrants on electronic devices, including cellphones, and in obtaining location information for those devices.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses which I have found to be reliable. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the TARGET ADDRESS and TARGET VEHICLE contain evidence violations of distribution and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841, conspiracy to distribute controlled substances, in violation of Title 21, United States Code, Section 846, and maintaining a drug-involved premises, in violation of Title 21, United States Code, Section 856. There is probable cause to search the locations described in Attachment A for evidence, contraband, and/or fruits of these crimes further described in Attachment B.

**IDENTIFICATION OF THE PROPERTY TO BE SEARCHED AND SEIZED**

6.      The TARGET ADDRESS is a residence located at 100 Bright Star Court, Lynchburg, Virginia 24504. That residence is described as a single story, vinyl sided, single family residence. The numbers "100" are posted on a support beam of the front porch of this residence. The TARGET ADDRESS is believed to the residence of Taurus MCDANIEL and where he resides most often. A photograph of the residence is attached to Attachment A.

7.      The TARGET VEHICLE is a white 2007 Lexus LS460 (VIN: JTHGL46F475014911). The registered owner of the vehicle is MCDANIEL. The vehicle has been observed at the TARGET ADDRESS on numerous occasions in April and May 2023.

**PROBABLE CAUSE**

**Identification of Taurus MCDANIEL as a Narcotic Distributor**

8.      The United States, including Drug Enforcement Administration ("DEA"), Bureau of Alcohol, Tobacco, Firearms, and Explosive ("ATF"), and the Lynchburg Police Department ("LPD"), is conducting a criminal investigation of Taurus MCDANIEL ("MCDANIEL"), Quentin RANDOLPH ("RANDOLPH"), and others regarding violations of distribution and

possession with intent to distribute methamphetamine and other controlled substances, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to distribute methamphetamine and other controlled substances, in violation of 21 U.S.C. § 846, in the Western District of Virginia and elsewhere.

9.      As outlined below, MCDANIEL has been identified as a source of supply to multiple co-conspirators, in addition to others in the Lynchburg area, with distributable amounts of crystal methamphetamine. MCDANIEL's home residence was identified as 100 Bright Star Court, Lynchburg, Virginia (TARGET ADDRESS). MCDANIEL is a convicted felon, with convictions for 2nd Degree Murder and Possessing Cocaine with the Intent to Distribute. MCDANIEL's vehicle was identified as the TARGET VEHICLE.

10.     RANDOLPH has been identified as a source of supply to co-conspirators in the Lynchburg (Virginia) area with distributable amounts of crystal methamphetamine.

11.     Markell MELLETTE has been identified as a source of supply to co-conspirators in the Lynchburg (Virginia) area with distributable amounts of crystal methamphetamine. MELLETTE has been charged with conspiracy to distribute methamphetamine and cocaine, distribution of methamphetamine, and possession with the intent to distribute cocaine (Case Number 6:22-cr-22).

12.     In September 2022, law enforcement executed a federal search warrant (622mj11) on a cellular device identified as being used by Markell MELLETTE to facilitate narcotic transactions. A search of the data extracted from the device determined that MELLETTE was exchanging text messages with cellular phone number 434-473-9051. That number was saved under the contact name of "Taurus Big Billy". This affiant knew "Billy" to be a term used to

describe a rank of the BLOODS criminal gang. This affiant knew MCDANIEL and MELLETTE to be known members of the BLOODS criminal gang.

13.     This affiant subpoenaed the carrier of 434-473-9051 for subscriber and toll record data associated with the number. Based on the provided data, law enforcement determined that the subscriber of the account was "Taurus MCDANIEL".

14.     This affiant determined that MELLETTE was exchanging text messages with MCDANIEL (434-473-9051) between October 2021 and June 2022. Of the exchanged messages, MCDANIEL asked MELLETTE how much a "quarter p… (of) weed" was. MELLETTE requested "10 glizzys" (street slang for ten Glock pistols). MCDANIEL later sent MELLETTE two photographs of a semi-automatic pistol. MCDANIEL advised that the pistol would be "7" or a "zip" (slang for an ounce of a controlled substance). MCDANIEL later sent a photograph of a semi-automatic pistols and advised that it would be "21 grams for u". MCDANIEL then sent a photograph of another semi-automatic pistol. MCDANIEL called it a "glizzy". MCDANIEL advised that the pistol was "going for a whole zip".

15.     On December 21, 2022, MCDANIEL was arrested by the Lynchburg Police Department on an active arrest warrant for Possessing a Firearm by a Convicted Felon. During the course of that arrest, a cellular phone was found on/about his person. On January 12, 2023, law enforcement obtained and executed a search warrant (6:23mj6) authorizing the extraction of the data contained on the device.

16.     Law enforcement later analyzed the data and determined that the Facebook Messenger application had been installed onto the device. The account that was logged onto the application was found to be of the user name "Taurus McDaniel".

17.     Law enforcement analyzed some of the messages exchanged from that account. Those messages included, but not limited to, MCDANIEL discussing the sale of a "M Ball" (with an ice cube emoji) and "hp of a M" with the user of the other account. Those messages were exchanged in December of 2022. This affiant knew "M" to be slang for methamphetamine. This affiant knew an ice cube emoji to be used as a symbol for methamphetamine.

18.     Law enforcement also located messages exchanged on the account with a different Facebook Messenger user. Those messages were exchanged in December of 2022. Those messages included, but not limited to, MCDANIEL receiving a video and a photograph from that user. That media was not able to be reviewed on the data extraction. MCDANIEL responded to the video stating, "I got that same joint, with the drum too, you don't got nothing else, hand joints??". This affiant believed, from training and experience, a "drum", in this context, referred to a drum-type magazine used for a rifle. This affiant believed, from training and experience, that "hand joints" were being referred to as hand guns. MCDANIEL later messaged that user that MCDANIEL had an "AR for 500". This affiant knew, from training and experience, that "AR", in this context, referred to an AR-15 rifle.

19.     In/about January 2023, law enforcement conducted an interview of a Confidential Source ("CS-1"). CS-1 is an uncharged co-conspirator of this investigation. The CS-1 provided information in hopes of receiving consideration on any potential sentence the CS-1 may receive. CS-1 has provided information to law enforcement against CS-1's own penal interest. CS-1 is a convicted felon, to include narcotic trafficking offenses. During that interview, CS-1 identified RANDOLPH as a source of supply for crystal methamphetamine.

20.     On March 7, 2023, law enforcement conducted surveillance of Malakia BOOKER. BOOKER was identified as the girlfriend of MCDANIEL. This identification was

made, in part, by reviewing open source Facebook posts in which BOOKER and MCDANIEL were proclaiming the relationship on their Facebook accounts. BOOKER was identified as also residing at the TARGET ADDRESS. BOOKER and MCDANIEL have also been observed with each other, by law enforcement, at the TARGET ADDRESS. During that surveillance, law enforcement determined BOOKER had just purchased a firearm from a licensed firearm dealer in Lynchburg, Virginia. Law enforcement then followed BOOKER from that dealer directly to the TARGET ADDRESS.

21.     On March 14, 2023, law enforcement met with CS-1 for the purpose of making a controlled methamphetamine purchase from RANDOLPH. During that controlled purchase, CS-1 communicated with RANDOLPH via cellular phone to further facilitate the transaction. RANDOLPH advised that "the man is waiting on us". CS-1 was searched before and after the transaction. Law enforcement did not locate any currency or contraband on CS-1 's person. During the controlled purchase, CS-1 provided RANDOLPH with currency to purchase methamphetamine. Law enforcement then followed RANDOLPH to the TARGET ADDRESS.

22.     During the course of the controlled purchase, law enforcement observed multiple vehicles parked on the curtilage of the TARGET ADDRESS. The TARGET VEHICLE was one of the vehicles parked on the curtilage. RANDOLPH waited on the porch of the residence until another vehicle, also (at that time) registered to MCDANIEL, arrived at the TARGET ADDRESS. MCDANIEL was observed exiting the vehicle and meeting with RANDOLPH on the porch of the TARGET ADDRESS. RANDOLPH then walked back to CS-1 and provided CS-1 with a substance that was later determined to be 111.68 grams of a mixture containing methamphetamine.

23.     On March 21, 2023, CS-1 made a controlled phone call to RANDOLPH to discuss facilitating a future purchase of methamphetamine and discuss the price of the methamphetamine. During that call RANDOLPH advised that he would have to call to someone regarding reducing the price of the methamphetamine. CS-1 received a call back from RANDOLPH a few moments later and RANDOLPH agreed to reduce the price.

24.     Law enforcement subpoenaed the carrier for the number used by RANDOLPH to facilitate the controlled called on March 21, 2023. Law enforcement later received that data and determined that at the time in which RANDOLPH stated that he had to make a call about the price of methamphetamine RANDOLPH called a cellular phone number associated with Verizon Wireless, later determined to be used by MCDANIEL. Law enforcement submitted a preservation request to Verizon Wireless for the data associated with that account.

25.     On March 22, 2023, law enforcement met CS-1 to conduct the controlled purchase discussed on March 21, 2023. During that controlled purchase, CS-1 communicated with RANDOLPH via cellular phone to further facilitate the transaction. CS-1 was searched before and after the transaction. Law enforcement did not locate any currency or contraband on CS-1's person. During the controlled purchase, CS-1 provided RANDOLPH with currency to purchase methamphetamine. Law enforcement then followed RANDOLPH to the TARGET ADDRESS.

26.     During the controlled purchase, law enforcement observed the TARGET VEHICLE parked on the curtilage of the TARGET ADDRESS. RANDOLPH was observed leaving the TARGET ADDRESS, meeting back CS-1, and ultimately providing CS-1 with a crystalline substance that later determined to be 167.70 grams of mixture containing

methamphetamine. Law enforcement then observed MCDANIEL leaving the TARGET ADDRESS in the TARGET VEHICLE shortly after RANDOLPH left the residence.

27.     On April 21, 2023, law enforcement obtained and executed a search warrant (623mj19) on Verizon Wireless for the data associated with the cellular account identified during the controlled phone called placed on March 21, 2023.

28.     Law enforcement later analyzed the data associated with the information obtained from Verizon Wireless authorized by the aforementioned search warrant (623mj19). Multiple text messages from other cellular phone numbers sent to the user of the phone identified the user as "Taurus". Further, the user sent the message "This Taurus it was nice meeting u" to another phone number. Accordingly, law enforcement believes this phone to have been actively used by MCDANIEL.

29.     Within these messages, law enforcement determined that on March 21, 2023, RANDOLPH sent a text message to that number stating "…probably be today or tomorrow ima need that 4way again…". This affiant knew "4way" to be street slang for four ounces of a controlled substance.

30.     On April 21, 2023, law enforcement met with CS-1 for the purpose of making a controlled methamphetamine purchase from RANDOLPH. During that controlled purchase, CS-1 communicated with RANDOLPH via cellular phone to further facilitate the transaction. CS-1 was searched before and after the transaction. Law enforcement did not locate any currency or contraband on CS-1's person. During the controlled purchase, CS-1 provided RANDOLPH with currency to purchase methamphetamine. Law enforcement then followed RANDOLPH to the TARGET ADDRESS. Just prior to RANDOLPH arriving at the house, MCDANIEL was

observed arriving to the TARGET ADDRESS in the TARGET VEHICLE, and then walking into the TARGET ADDRESS.

31.     RANDOLPH then was observed leaving the TARGET ADDRESS, meeting back with CS-1, and ultimately providing CS-1 with a crystalline substance that was consistent with crystal methamphetamine.

32.     On May 17, 2023, law enforcement met with CS-1 for the purpose of making a controlled methamphetamine purchase from RANDOLPH. During that controlled purchase, CS-1 communicated with RANDOLPH via cellular phone to further facilitate the transaction. CS-1 was searched before and after the transaction. Law enforcement did not locate any currency or contraband on CS-1's person. During the controlled purchase, CS-1 provided RANDOLPH with currency to purchase methamphetamine. Law enforcement then followed RANDOLPH to the 1800 block of the Florida Avenue. That block of Florida Avenue contains an intersection with Bright Star Court. Law enforcement temporarily lost sight of RANDOLPH in that area. A short period of time later, law enforcement observed RANDOLPH walking through the backyard of the TARGET ADDRESS and directly away from that residence. During the course of the controlled purchase, a vehicle registered to MCDANIEL was parked on the curtilage of the TARGET ADDRESS.  RANDOLPH then was observed meeting back with CS-1, and ultimately providing CS-1 with a crystalline substance that was consistent with crystal methamphetamine.

33.     Approximately two hours later, law enforcement observed a male, matching the description of MCDANIEL walking out of the TARGET ADDRESS, getting into the TARGET VEHICLE that was parked on the curtilage of the TARGET ADDRESS during the controlled purchase, and leave the property.

34.     In May of 2023, law enforcement conducted a consensual interview of Confidential Source #2 ("CS-2"). CS-2 has multiple prior convictions, including felonies, for larceny offenses, assault and battery, criminal trespass, contempt of court, possession of controlled substances, and probation violations. CS-2 was the target of a state investigation in which CS-2 was facilitating multiple, ounce quantity methamphetamine transactions in Western District of Virginia. During the interview, CS-2 identified RANDOLPH as a source of supply of methamphetamine. CS-2 advised that for approximately one year, leading up to the interview, CS-2 was obtaining upwards of four ounces of methamphetamine from RANDOLPH on a daily basis. CS-2 advised that on majority of those transactions, CS-2 would take RANDOLPH to Gilmore Circle (Lynchburg, Virginia) and drop RANDOLPH off. CS-2 would then observe RANDOLPH walk towards the direction of the TARGET ADDRESS. It should be noted that Gilmore Circle is one block away from the TARGET ADDRESS. RANDOLPH would then come back with methamphetamine and provide it to CS-2. CS-2 advised that on at least two of those occasions, CS-2 observed RANDOLPH go into directly in the TARGET ADDRESS.

### Identification of and Continued Criminal Activity Associated with the TARGET ADDRESS AND TARGET VEHICLE

35.     Law enforcement queried the utility account associated with the TARGET ADDRESS. Based on the account information it was determined that MCDANIEL was the account holder for the utilities of the TARGET ADDRESS. The "move in" date was found to be January 4, 2022. The phone number associated with the utility account was the same number used to communicate with MELLETTE, as previously mentioned regarding the search warrant (622MJ11) executed on MELLETTE's cellular phone.

36.     Further analysis of the data obtained from the search warrant (6:23mj6) executed on MCDANIEL's cellular device revealed multiple messages sent from MCDANIEL identifying

the TARGET ADDRESS as MCDANIEL's residence and a location in which narcotic transactions occurred. Those messages include but are not limited to the following:

    a.   In April of 2022, a subject messaged MCDANIEL asking for a "half g and 20 h". This affiant knew "half g" to be street slang for one half of a gram. This affiant knew "20 h" to be street slang for $20 worth of Heroin".

    b.   In November 2022, MCDANIEL messaged a subject stating that his "home" was on "Brightstar ct". This is consistent with a description of the TARGET ADDRESS.

    c.   In November 2022, MCDANIEL received a message "could cop a half of sum soft off u"?. MCDANIEL responded "100 Brightstar ct". This identified the TARGET ADDRESS. This affiant knows "soft" to be street slang for powder cocaine.

    d.   In December of 2022, MCDANIEL provided "100 Brightstar ct" to another individual. This identified the TARGET ADDRESS.

    e.   In December of 2022, an individual messages MCDANIEL advising that he would bring "bud" to MCDANIEL's house. MCDANIEL responded "100 Brightstar ct". This identified the TARGET ADDRESS. This affiant knew "bud" to be street slang for marijuana.

37.   Law enforcement conducted an open-source search of MCDANIEL's Facebook account. During that search, law enforcement observed that a "selfie" video of MCDANIEL standing in the driveway of the TARGET ADDRESS was uploaded to the account's page on May 11, 2023.

38.     Law enforcement conducted an open source search of MCDANIEL's Facebook account. During that search, law enforcement observed that a "reel" (slide of photographs) containing photographs of MCDANIEL standing on the back porch of the TARGET ADDRESS was uploaded to the account on May 20, 2023.

39.     Throughout surveillance of MCDANIEL during April and May 2023, and on multiple occasions, MCDANIEL has been observed operating the TARGET VEHICLE.

40.     Based on the aforementioned, your affiant respectfully submits that there is probable cause to believe that Taurus MCDANIEL, and others, have violated Title 21, United States Code, Section 841, distribution of methamphetamine, and Title 21, United States Code, Section 846, conspiracy to distribute controlled substances, and that drugs, documentation, and other items related to the illegal distribution of methamphetamine will be located in the TARGET ADDRESS and TARGET VEHICLE.

41.     Based upon my training, expertise, and experience, I know that:

a.   Distributors of controlled substances and money launderers often keep ledger books, telephone books, receipts, drug/money customer lists, photographs and other papers that identify co-conspirators and their locations or residences and that relate to the importation, transportation, purchasing and distribution of controlled substances and proceeds derived from said sales;

b.   Drug traffickers generate substantial profits because of drug dealing which the courts have recognized as probative evidence of crimes motivated by greed, in particular, trafficking controlled substances.  Drug traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement agencies.  These assets often are placed in other person's names, even though the

13

drug dealers continue to use these assets and exercise dominion and control over them.  They also often maintain on hand large amounts of United States currency in order to operate and finance their ongoing drug business;

c.  Drug traffickers commonly "front" (i.e. provide on consignment) controlled substances to their clients and the aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the drug traffickers have ready access to them. It is common practice for large-scale drug dealers to conceal contraband, proceeds and drug sales and records of drug transactions in secure locations within their residences, stash houses, and/or places of business for ready access and to conceal such items from law enforcement authorities.  Persons involved in large scale drug trafficking often conceal in their residences, stash houses, and/or places of business, caches of drugs, large amounts of currency, financial instruments, precious metals, jewelry, automobile titles and other items of value which are proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting or spending large sums of money acquired from engaging in narcotics trafficking activities;

d.  When drug traffickers amass large proceeds from the sale of drugs, they often attempt to legitimize or "launder" these profits.  To accomplish this, drug traffickers may utilize, but are not limited to, domestic and foreign banks and/or financial institutions and their attendant services, such as securities, cashier's checks and money drafts;

e.  It is common practice for large-scale drug traffickers to travel to their source and distribution points to facilitate their trafficking.  After purchasing their drugs,

14

drug traffickers often transport or cause to be transported their drugs to areas in which they will distribute them.  The methods of transportation include, but are not limited to, commercial carriers, private airplanes, ocean going motor vessels, rental or private automobiles, and government or contract mail carriers;

f.   Drug traffickers commonly cause to be taken photographs of themselves, their associates, their property and items used in the distribution of controlled substances.  These traffickers usually maintain these photographs at their residences or places of business;

g.   Narcotics traffickers use safes, surreptitious compartments and money counting machines to count and store the profits of their narcotics business;

h.    Narcotics traffickers commonly possess at their residences, stash houses, or places of business, drugs, paraphernalia, and materials for packaging, cutting, weighing and distributing heroin, including, but not limited to scales, plastic wrap, plastic baggies, paper slips, tin foil, stamp pads, stamp ink and various cutting agents;

i.   Drug traffickers commonly use electronic devices and storage components including, but not limited to, cellular telephones, computers, telex machines, facsimile machines, currency counting machines, telephone answering machines, computer software, tapes, discs, CD, DVDs,  and audio tapes to store records of drug sales, ledgers, supplier's/customer's contact information, financial records, images, audio/video recordings and other related documents related to the trafficking and sale of narcotics;

42.     Based on the aforementioned, your affiant respectfully submits that there is probable cause to believe that U.S. Currency, documentation, and/or other items related to the illegal distribution of narcotics and money laundering further described in Attachment B will be located at the TARGET ADDRESS and TARGET VEHICLE.

**COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

43.     As described above and in Attachment B, this application seeks permission to search for records that might be found at the TARGET ADDRESS and TARGET VEHICLE, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

44.     *Probable cause.*  I submit that if a computer or storage medium is found at the TARGET ADDRESS and TARGET VEHICLE, there is probable cause to believe relevant records will be stored on that computer or storage medium, for at least the following reasons:

      a.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

45.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the Crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the TARGET ADDRESS and TARGET VEHICLE because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs

17

store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.   As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the Criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the Crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a Crime

(e.g., internet searches indicating Criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.  I know that when an individual uses a computer to communicate online with a victim in a fraud scheme, the individual's computer will generally serve both as an instrumentality for committing the Crime, and also as a storage medium for evidence of the Crime.  The computer is an instrumentality of the Crime because it is used as a means of committing the Criminal offense.  The computer is also likely to be a storage medium for evidence of Crime.  From my training and experience, I believe that a computer used to commit a Crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the Criminal conduct was achieved; records of Internet discussions about the Crime; and other records that indicate the nature of the offense.

46.  *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premise for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the

warrant. In lieu of removing storage media from the premises, it is sometimes possible to make

an image copy of storage media.  Generally speaking, imaging is the taking of a complete

electronic picture of the computer's data, including all hidden sectors and deleted files.  Either

seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded

on the storage media, and to prevent the loss of the data either from accidental or intentional

destruction.  This is true because of the following:

> a. <u>The time required for an examination</u>. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

> b. <u>Technical requirements</u>.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

> c. <u>Variety of forms of electronic media</u>.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

47.     *Nature of examination.*  Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying

storage media that reasonably appear to contain some or all of the evidence described in the

warrant, and would authorize a later review of the media or information consistent with the

warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

48.     Based on my training, experience, and the foregoing facts set forth herein, I believe that probable cause exists to search the TARGET ADDRESS (100 Bright Star Court, Lynchburg Virginia 24504) along with the curtilage surrounding that address, and the TARGET VEHICLE (2007 Lexus LS460 (VIN: JTHGL46F475014911) described in Attachment A, and to seize items described in Attachment B.

49.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the devices described in Attachment A, in order to seek the items described in Attachment B.

## OATH

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

> _s/Daniel Bailey_
> Daniel Bailey, Task Force Officer
> Drug Enforcement Administration

Received by reliable electronic means and sworn and attested to by telephone on this _1st_ day of June 2023.

_Robert S. Ballou_
ROBERT S. BALLOU
UNITED STATES DISTRICT COURT JUDGE